```
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
In re:                                            :
                                                  :    Chapter 11
PINE TREE MALL ASSOCIATES                         :
LIMITED PARTNERSHIP,                              :    Case No. 09-10688 (SMB)
                                                  :
                Debtor.                           :
------------------------------------------------------X
```

## MEMORANDUM DECISION AND ORDER REGARDING
## VALUATION OF THE DEBTOR'S REAL PROPERTY

**A P P E A R A N C E S:**
RATTET, PASTERNAK & GORDON-OLIVER, LLP
Attorneys for Debtor
550 Mamaroneck Avenue
Harrison, New York 10528

      Robert L. Rattet, Esq.
      Jonathan Pasternak, Esq.
      James B. Glucksman, Esq.
          Of Counsel


ARONAUER, RE & YUDELL, LLP
Attorneys for U.S. Bank
444 Madison Avenue
New York, New York 10022

      Joseph Aronauer, Esq.
          Of Counsel


BENOWICH LAW, LLP
Attorneys for Rosenfeld Bernstein & Tannenhauser LLP
1025 Westchester Avenue
20 Suite 106
White Plains, New York 10604

      Leonard Benowich, Esq.
          Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

The debtor and the mortgagee in this case, which concerns a shopping mall, disagree over the value of the asset. Against this backdrop, the debtor seeks to confirm a plan over the mortgagee's objection, and the mortgagee seeks relief from the stay, contending that the debtor cannot confirm its plan. The Court separated the valuation issue, which affects both motions, and conducted a two-day evidentiary hearing. Based on the evidence adduced at the hearing, the Court finds that the value of the debtor's property is $8,550,000.

## BACKGROUND

Pine Tree Mall Associates Limited Partnership (the "Debtor") owns a 309,954 square-foot shopping mall located at 2800 Roosevelt Road, Marinette, Wisconsin (the "Property"). The Property is encumbered by a first mortgage held by U.S. Bank (the "Bank Mortgage") and a second mortgage held by Rosenfeld Bernstein & Tannenhauser LLP ("RBT"), as Trustee (the "RBT Mortgage").

The Debtor filed a chapter 11 petition in this Court on February 17, 2009 (the "Petition Date"). The Bank filed a proof of claim in the amount of $10,489,913.45, and estimated the value of the Property to be $9.2 million. As a result, it asserted a secured claim in the latter amount and an unsecured claim in the sum of $1,289,913.45. Pursuant to a <u>Stipulation and Order Providing for Debtor's Use of Cash Collateral</u>, dated Mar. 17, 2009 (ECF Doc. #25), the Debtor and the Bank agreed that the Bank held a perfected senior lien in the Property and its rent, and the Debtor agreed to make monthly adequate protection payments in the sum of $93,334.82 (as well as monthly escrow payments of $37,532.56 for taxes and insurance). As of December 2009, the Bank had received $1,026,683 in adequate protection payments.

- 2 -

The Debtor scheduled RBT Mortgage as a noncontingent, liquidated, undisputed debt in the sum of $1,516,500.15.[1] Pursuant to the aforementioned stipulation, the Debtor reserved the right to continue making mortgage payments to RBT. The record does not reflect whether the Debtor made any postpetition payments in connection with the RBT Mortgage.

The Debtor filed a plan of reorganization on June 17, 2009 (the "Plan"). (Plan Of Reorganization Under Chapter 11 Of The Bankruptcy Code, dated June 17, 2009 (ECF Doc #40).) The Plan establishes five classes, and all but Class 1—non-tax priority claims—are impaired. Classes 2 and Class 3 consist, respectively, of the Bank's and RBT's secured claims. The Plan proposes to make monthly payments to each class based on a 30-year amortization schedule, with interest at the prime rate plus 2%, and a balloon payment on the earlier of five years or sale or refinancing of the Property. Both classes will retain their liens until their secured claims have been satisfied. (Id. at 14-15.) Class 4, the general unsecured claims, will receive 95% of the allowed amount of their claims, without interest, in eight quarterly installments beginning on the first day of the first calendar quarter after the effective date. (Id. at 15.) Finally, Class 5 consists of equity holders. Their equity interests will be cancelled, and they will be deemed to reject the Plan.[2] (Id. at 13-15.)

On October 26, 2009, the Bank moved to lift the automatic stay. (First Mortgagee's Application for Relief from the Automatic Stay, dated Oct. 26, 2009 (ECF Doc. # 81).) It argued that the Plan was unconfirmable because, inter alia, the Debtor would not be able to procure an impaired accepting class as required by 11 U.S.C. § 1129(a)(10). The Bank would vote its Class

---

[1] The Claims Register does not reflect that RBT filed a proof of claim.

[2] Equity in the Reorganized Debtor will be distributed to the Plan Funder, i.e., existing equity that participate in the funding of the Plan Confirmation Contribution. (Plan at 15.)

- 3 -

2 claim against the Plan, (Affidavit of Joseph Aronauer, sworn to Oct. 26, 2009, at ¶ 9) (see ECF Doc. #81), and its unsecured claim was sufficient to cause Class 4 to reject the Plan. (Id. ¶ 12.) Finally, Class 3, the only potential accepting class, consisted of insiders, and could not qualify as an impaired accepting class. (Id. ¶ 10.)

The Debtor solicited the votes of the creditors in Classes 2, 3 and 4 in November 2009. (See Certification of Ballots, dated December 14, 2009 (ECF Doc. #103).) Classes 2 and 4 rejected the Plan, but Class 3 unanimously accepted the Plan. In addition to its insider status, the Bank contends that the Class 3 vote was improperly cast by the loan participants who lacked standing to vote. (Transcript of hearing, held Dec. 15, 2009, at 11-12 (ECF Doc. # 106).)

**B.    Valuation Hearing**[3]

The valuation of the Property was an issue common to the Debtor's ability to confirm the Plan and the Bank's right to relief from the stay.[4] Accordingly, the Court separated that issue from the others, and conducted a two day trial on January 27 and 28, 2010. The Bank offered the expert testimony and report of Gary Declark, and the Debtor offered the expert testimony and report of Duane Debelak. Both qualified as experts to opine on the valuation of the Property.[5]

---

[3]    The following conventions are used in citing to the trial record. The daily transcript is cited by date and page. For example, "Tr. (1/27) at 10" refers to Page 10 of the January 27, 2010 transcript. "Declark Report" refers to Gary Declark's July 2009 report, which was received as the Bank's Exhibit ("BX") 2 at the trial. "Debelak Report" refers to Debelak's May 2009 report, which was received as the Debtor's Exhibit ("DX") A at the trial. The page references to the Debelak Report refer to the Bates-stamped numbers.

[4]    The parties agreed that the Court should determine the value as of the date of the hearing. (Tr. (1/28) at 110-12.)

[5]    At trial, the Debtor's counsel contended that Declark should not be allowed to testify because, although he was qualified to appraise property in Wisconsin, he was not a qualified appraiser in New York. The Court granted the Debtor's counsel the opportunity to submit a letter brief in support of his position, but he failed to do so. Accordingly, the argument is deemed abandoned.

Each expert valued the Property primarily using the income-capitalization approach, which includes the discounted-cash-flow ("DCF") method and the direct-capitalization method.[6] Both used the sales-comparison approach as a secondary check on the results.[7] Each agreed that the cost approach was not an appropriate method to value the Property.[8] The primary focus of the testimony at the hearing focused on the direct-capitalization method.

The experts reached vastly disparate conclusions regarding the value of the Property. Declark opined that the Property was worth $8,550,000 as of July 1, 2009, reconciling a value of $8,520,000 under the DCF method with $8,600,000 under the direct-capitalization method.[9] (Declark Report at 100.) Debelak valued the Property at $13,000,000, as of May 1, 2009, reconciling $13,420,000 under the DCF method with $12,740,000 under the direct-capitalization method. (Debelak Report at DA0118.) Three principal areas accounted for most of the difference: (1) the date that the Property was deemed to be stabilized, (2) the capitalization rate, and (3) the amount of real estate taxes. I now turn to these three areas.

1. **Stabilization**

A property is stabilized "when income and expenses are moving along at expected paces and occupancy in the mall is at market levels." (Tr. (1/27) at 40.) The stabilization period refers to the time it will take for an unstabilized Property to become stabilized. The length of the

---

[6] The income-capitalization approach "reflects the market's perception of a relationship between a property's potential income and its market value." (Declark Report at 46; accord Debelak Report at DA0076 ("The Income Approach is a mathematical measure of what an investor would pay to acquire a property which can reasonably be expected to produce a certain level of net operating income over its remaining economic life").)

[7] "The sales comparison approach assumes that an informed purchaser would pay no more for a property than the cost of acquiring another existing property with the same utility." (Declark Report at 46.)

[8] "The cost approach assumes that the informed purchaser would pay no more than the cost of producing a substitute property with the same utility." (Declark Report at 46.)

[9] Declark had previously appraised the Property at $9.2 million, as of January 1, 2009. (BX 1, at 2.)

- 5 -

stabilization period affects the income and expenses, and hence, the cash flows, generated by the Property.  Absorption refers to the leasing of the vacant space.

Declark determined that the market stabilization rate was 12.5%, "[b]ased on the center's size, location in a tertiary market, recent tenant losses and national retail market outlook." (Declark Report at 79.)  At the time of his report, 42,008 square feet, or 13.6% of the leasable space, was vacant.  (See id. at 59, 61.)  Declark assumed that none of the vacant space would be absorbed until January 2012, or two-and-one-half years after the date of his report, (id. at 93), and the vacant space would then be absorbed at the rate of 500 square feet per month.  (Id. at 92.)  His direct capitalization analysis accounted for the delay by deducting three years' worth of "lease-up" costs, aggregating $630,000, from the value of the Property.  (See id. at 91.)  The "lease-up" costs consisted of lost income, tenant improvements and leasing commissions, discounted back at the rate of 13% to present value.  (Id.)

According to Debelak's report, the Property's vacancy rate and the stabilized vacancy rate were both 13.5%.  (Debelak Report at DA0097 ("[T]he stabilized vacancy and collection loss factor for the subject is projected at 13.5%. This is also the current vacancy rate.").)  At trial, however, he essentially adopted Declark's market vacancy rate of 12.5%, but added that the difference between market vacancy rate and the vacancy rate of the property was insignificant. (Tr. (1/28) at 11.)  Hence, he adhered to the position in his report that the Property was already stabilized.  (Id.)  Debelak also assumed that the vacant space would be absorbed, beginning in August 2009, at the rate of 3,471 square feet per quarter.  (Debelak Report at DA0097)

I find from the evidence that the market stabilization rate is 12.5%, and at the time of the expert's reports, the vacancy rate was 13.5%.  I do not agree with Debelak that these are

- 6 -

essentially the same, and reject Debelak's conclusion that the Property was stabilized at the time of his report. The 1% difference represents lost income attributable to roughly 3,000 square feet of rentable space.

I also accept Declark's assumption that there will be some delay in achieving stabilization, although time has proven that his estimate may have been too conservative. As noted, he assumed in July 2009 that no absorption would occur until January 2012. However, the Debtor's December 2009 rent roll showed 40,255 square feet, or 13%, of vacant space. (BX 11.) This implied that during the approximate six months following the date of the Declark Report, the Property had absorbed 1,753 of vacant space. On the other hand, the absorption rate was slower than the 500 square feet per month that he projected (beginning in 2012), and substantially slower than the 3,471 square feet per quarter that Debelak expected to begin in August 2009. In other words, absorption began sooner than Declark predicted, but at a slower rate. Furthermore, leases expiring in the next three years account for 31,490 square feet, or 10% of the rentable space on the Property. (Declark Report at 61.) Declark assumed a 65% renewal probability, (id. at 79), as did Debelak, (Debelak Report at DA0096), raising the possibility that an additional 10% of space will become vacant during Declark's expected stabilization period. Under the circumstances, Declark's assumption that it will take three years to achieve stabilization is reasonable.

### 2. The Capitalization Rate

The income-capitalization method uses two different capitalization rates. "In direct capitalization, a single year's expected income is divided by an appropriate capitalization rate to arrive at a value indication." (Declark Report at 57.) The rate represents what an investor would pay for a certain cash flow. (Tr. (1/28) at 40.) Both experts applied this rate, the "going-in"

rate, to the income produced during the first year of stabilization to arrive at the Property's value. For example, if the net operating income in the first stabilized year is projected to be $1 million, and an investor would insist on a 10% return, the capitalization rate would be 10% and the property would be worth $10 million. As discussed above, the value might be subject to further adjustments, particularly when it will take time to achieve stabilization. The second capitalization rate, the "reversionary" or "residual" rate, is used in DCF analysis to calculate value at the end of a holding period. (Id. at 42:14-15.) The testimony focused on the direct-capitalization method, and, therefore, centered on the "going-in" rate.

Declark calculated a "going-in" capitalization rate relying on an analysis of comparable sales, a review of national investor surveys, and interviews with real estate experts. Comparable sales yielded an average capitalization rate of 9.67%,[10] but Declark opined that each of the comparables involved superior properties, and expected a capitalization rate of between 11% and 12% for the Property. (Declark Report at 86.) The national surveys, particularly the Korpacz Real Estate Investor Survey: Fourth Quarter 2009 ("Korpacz"),[11] indicated that capitalization rates for national power centers ranged between 6.5% and 10% with an average of 8.04%,[12] and RealtyRates.com noted a range of between 5.8% and 12.77%, with an average of 8.73%. "[C]onsidering the subject's income characteristics" Declark opined that the surveys yielded a capitalization rate of between 10% and 12%. (Declark Report at 88.) Finally, Declark

---

[10]    Declark's sales comparables included (1) Cherry Point Mall in Sturgeon Bay, WI; (2) Walmart Supercenter in Platteville, WI; (3) Northland Center in Southfield, MI; (4) Marketplace Mall in Appleton, WI; (5) Knox Village Square, in Mt. Vernon, OH; and (6) Rapids Mall in Wisconsin Rapids, WI. (Declark Report at 86.)

[11]    Korpacz was received in evidence as BX 14. It is generally relied upon by real estate valuation experts.

[12]    Declark admitted during cross-examination was a "national regional mall" rather than a "national power center." (Tr. (1/27) at 134-35.) While the average overall capitalization rate for national power centers was slightly higher than the comparable rate for national regional malls, (see BX 14 at 28-29), the average rate applicable to the Property was higher than both. Hence, the mistake had no material affect on his opinion.

interviewed four real estate professionals, and expected a capitalization rate of between 11% and 13% based on these discussions. (Id. at 89.) Declark took all of this information into account, made adjustments based on the Property's income characteristics, competitive market position, location, market and highest and best use, and arrived at an overall "going-in" capitalization rate of 12.25%. (Id. at 90.)

Debelak calculated the "going-in" rate relying on comparable sales and Korpacz. The comparable sales yielded a range of capitalization rates between 7.6% and 11.22%, and an average rate of 9.09%. (Debelak Report at DA0116.)[13] According to Korpacz, the "going-in rate" for national regional malls ranged between 5% and 11%, and averaged 7.79%. (Id.) His report concluded that the expected "going-in" capitalization rate for the Property was 8.75%. (Id. at DA0117.) At trial, however, he said that this rate was too low, and he would now use 10.5%. (Tr. (1/28) at 40-41.)

The change appears to relate to the uncertainties engendered by Walmart's possible relocation. Walmart is one of the anchor tenants, and arguably, the Property's most significant draw. Rumors have spread that Walmart is constructing its own supercenter at a nearby location, (BX 4), and this may adversely impact the Property's ability to renew leases and find new tenants. In fact, Declark performed a supplemental valuation in December 2009, which assumed that Walmart would vacate its leased space at the conclusion of its term, January 27, 2018.[14] Relying solely on a DCF analysis, he concluded that the Property was worth only $7,360,000, compared to a value of $8,520,000 yielded by the DCF in July 2009. (BX 3 at 8.)

---

[13] Debelak used four comparable sales: East Town Mall in Brown County, WI; Memorial Mall in Sheboygan County, WI; Glenwood Crossing in Kenosha, WI; and Rapids Mall in Wisconsin Rapids, WI. (Debelak Report at DA0059-66.)

[14] Walmart can leave sooner but remains obligated to pay rent until the end of the term.

- 9 -

I give greater weight to Declark's credentials, experience, and methodology, and I find that the appropriate capitalization rate is 12.25%. In addition, I note that his January 2009 valuation used a capitalization rate of 11.75%. (BX 1 at 84.) Litigation experts often tend to become advocates for their clients, and the earlier valuation was prepared before the Petition Date. Issues relating to confirmation, stay relief and adequate protection, which are directly impacted by the value of the collateral, had not yet surfaced, and would not have affected Declark's January valuation. Furthermore, the capitalization rate he selected in July 2009 reflected a mere 4.26% increase over the January rate. This is substantially less than the change during 2009 in the average capitalization rates applicable to national regional malls.[15]

Finally, Korpacz reported that during the fourth quarter, the capitalization rates for Class B malls ranged between 8% and 12%, with an average of 9.63%. (Id.) Both experts agreed that the Property is a Class C mall. Korpacz did not supply information for Class C malls, but one can extrapolate the information provided in Korpacz for the better malls. In the fourth quarters of 2008 and 2009, the difference in average overall capitalization rates between Class A and B malls was approximately 1.7% (and the difference between Class A+ and B+ malls was approximately 1.45%.) (See id.). Extrapolating this information by adding 1.7% to the Class B average rate would yield a Class C average capitalization rate of 11.33%. Declark viewed the Property as falling at the lower end of the range (which was 12% for Class B malls), and the use of 12.25% is reasonable.

The threat of Walmart's departure does not require any further adjustment. Declark had already factored this risk into his calculations when he selected his capitalization rate. (Declark

---

[15] For example, between the fourth quarter of 2008 and the fourth quarter of 2009, the overall rate increased from 6.96% to 8.06%, or by 15.8%. (See BX 14 at 28.)

Report at 61 ("[T]he speculation as to the development tract purchased by Walmart inherently adds some risk."); id. at 90 (arguing that additional considerations, "most of all the flight-risk associated with Walmart," support the selection of the 12.25% capitalization rate.).). Although the local papers have reported that the Walmart move is picking up steam, (see BX 4), no competent evidence was offered to show whether or when the move will actually occur. I recognize that mere rumors of the Walmart move might have a psychological affect on an existing tenant's willingness to renew and a prospective tenant's willingness to sign a lease. Nevertheless, both valuations reflected that this rumor has been circulating for some time, and it would be speculative to ascribe an additional monetary effect to the current rumors. Finally, even if Walmart moves tomorrow, it is obligated to pay rent until its lease expires in early 2018.

### 3. Tax Expenses

The final major point of contention concerned the projected real estate tax expense. Under Wisconsin law, the tax assessor must value real estate "from actual view or from the best information that the assessor can practicably obtain, at the full value which could ordinarily be obtained therefor at private sale." Wis. Stat. § 70.32(1) (2010). In 2008, the market value of the Property had been assessed at $17,307,500, (Declark Report at 43), and the assessed value for tax purposes was 93.4% of the assessed market value, or $16,171,900. (Tr. (1/28) at 37; Declark Report at 43.) The assessed tax value is multiplied by the tax rate to arrive at the real estate tax liability, which is payable in the following year. In 2008, the Marinette County tax rate was 2.049%, and the real estate taxes on the Property payable in 2009 amounted to $331,409.

Declark thought the assessed market and tax values appeared high in light of his own opinion regarding value. To check the reasonableness of the assessments and taxes, he compared

them to three comparable properties. The Property's assessed per square foot tax values and taxes, $52.17 and $1.07 respectively, fell within the ranges of these comparables.[16] He concluded, therefore, that the taxes payable in 2009 were reasonable. (Declark Report at 43.)

Debelak disagreed: the $17 million assessment was too high in light of his conclusion that the Property was only worth $13 million. (See Debelak Report at DA0101). He maintained that prudent management would challenge the $17 million assessment and succeed. (Tr. (1/28) 44 ("When we appraise a property, we assume that there's prudent management, and there's people acting in their own self-interest.").) Assuming a $13 million assessed market value, he concluded that the ultimately tax liability payable in 2009 would be $247,690. (Debelak Report at DA0103.) Because of the reduced tax basis, Debelak's projected tax expenses were about $90,000 less per year than the taxes projected by Declark. (Compare Debalek Report at DA0103, with Declark Report at 97.)

Although Debelak's conclusion has superficial appeal, it suffers from several deficiencies. No evidence was offered to show that the Debtor's management has challenged the 2008 assessment. Debelak's testimony implies that the Debtor's management is neither prudent nor motivated by self-interest, but I reject this inference as unfounded. Instead, management may have concluded that an appraiser's view of market value is not enough to overcome an assessor's valuation, particularly when the assessor's valuation is consistent with the assessments involving comparable properties. Or management may have concluded that it would be difficult to challenge real estate taxes during a recession when Wisconsin, presumably like other states,

---

[16] The tax comparables Declark used were Shopko in Marinette, Roosevelt Center in Marinette, and East Lake Mall in Green Bay. Their assessed tax value ranged between $46.98 and $58.07 per square foot, and their taxes per square foot ranged between $0.96 and $1.33. (Declark Report at 43.)

- 12 -

needs revenue.  Regardless of the reason, it seems indisputable that absent a challenge, the 2009 tax liability will not change.

Accordingly, I find that the real estate tax rates, which are those either currently in effect or based on projections using that rate, should be used in valuing the Property under the income capitalization approach.

**C.    Recapitulation**

Having resolved the three primary disputed areas in favor of Declark's valuation opinion, I find, as Declark opined, that the value of the Property is $8,550,000.  The parties are directed to schedule a status conference to discuss the disposition of the remaining issues and the pending motions.  The foregoing constitutes the Court's findings of fact and conclusions of law.

So ordered.

Dated: New York, New York
       March 10, 2010

                                    /s/ *Stuart M. Bernstein*
                                    STUART M. BERNSTEIN
                                    United States Bankruptcy Judge